## Fogelsanger Estate

*Edwin D. Strite, Sr.,* for appellants.

*Rudolf M. Wertime,* for Commonwealth.

DEPUY, P. J., January 19, 1957.—This is an appeal by Harold H. Fogelsanger and Samuel W. Fogel-

sanger, executors of the last will of Mabel G. Fogelsanger, deceased, and Farmers and Merchants Trust Company of Chambersburg, administrator cum testamento annexo of the estate of Mabel G. Fogelsanger, deceased, from the Commonwealth appraisement for Pennsylvania Inheritance Tax filed April 8, 1954 (Appraisement Docket vol. P, p. 169, line 24), in the office of the Register of Wills of Franklin County.

Mabel G. Fogelsanger died December 1, 1953, and the inheritance tax appraisement filed in the estate, upon which the direct inheritance tax of two percent was levied, showed a total estate of $245,130.20 of which there is now in issue the sum of $62,848.40 which, as shown upon schedule "C" ("TRANSFERS MADE DURING LIFETIME OF DECEDENT WITHOUT CONSIDERATION") of the appraisement, consisted of approximately 22 issues of securities of various corporations and United States Government bonds which had been transferred by decedent to her sons, Harold H. Fogelsanger and Samuel W. Fogelsanger, and her daughter-in-law, Mrs. Helen T. Fogelsanger, on August 4, 1949, as to the amount of $11,388.40, and on dates between March 4, 1953, and March 12, 1953, as to the balance of $51,460.

The duly qualified personal representatives of decedent as named above, on June 7, 1954, filed an appeal from this appraisement as to that portion thereof which listed the securities just referred to, aggregating in value $62,848.40, and the amount of the tax thereupon, namely $1,256.97, was paid under protest. On June 11, 1954, a citation was granted upon the register to show cause why the appeal should not be sustained.

On August 24, 1954, this court appointed a master for the purpose of investigating any issues of fact raised by the petition for citation and by the answer of the register of wills and with instructions to report

his findings of fact, conclusions of law and recommendations to the court.

After taking testimony at a number of hearings, the master filed his report with the court on July 14, 1956, finding that the transfers just mentioned were not made in contemplation of death and therefore were not taxable. The Commonwealth on July 27, 1956, filed exceptions to the master's determination and on November 16, 1956, the master filed his supplemental report affirming his previous conclusions.

On November 20, 1956, the case was argued by counsel before the court upon the report of the master.

The report of the master in the present situation is advisory only and it is the duty of the court, exceptions on the part of the Commonwealth having been duly renewed on November 16, 1956, to examine the whole matter ab initio by reviewing the evidence received, and to make an independent determination upon the whole record.

The relevant statute provides: "A tax shall be, and is hereby, imposed upon the transfer of any property, real or personal, or of any interest therein or income therefrom in trust or otherwise, to persons or corporations in the following cases: . . .

"(c) When the transfer is of property made by a resident, or is of real property within this Commonwealth or of goods, wares, and merchandise within this Commonwealth, or of shares of stock of corporations of this Commonwealth, or of national banking associations located in this Commonwealth, made by a nonresident, by deed, grant, bargain, sale or gift made in contemplation of the death of the grantor, vendor, or donor, or intended to take effect in possession or enjoyment at or after such death.

"If such transfer is made within one year prior to the death of the grantor, vendor, or donor of a material part of his estate, or in the nature of a final dis-

position or distribution thereof, and without an adequate valuable consideration, it shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this clause." Transfer Inheritance Tax Act of June 20, 1919, P. L. 521, art. I, sec. 1, as last amended by the Act of May 11, 1949, P. L. 1083, sec. 1, 72 PS §2301.

All the transfers involved in the present argument were made within one year of death except the single transfer of 284 shares of stock of the Farmers and Merchants Trust Company of Chambersburg, which was made August 4, 1949, in the appraisal value of $11,388.40.

At none of the hearings before the master did the Commonwealth itself introduce any evidence at all. Thus there is no proof in the record other than the statutory presumption to sustain the Commonwealth's contention that the items appraised were taxable as having been transferred in contemplation of death. With regard to the transfer of August 4, 1949, made over four years preceding the death of decedent, we hereby find that this transfer was not made in contemplation of death and therefore confirm the conclusion of the master, that the property embodied in this transfer is not taxable.

With regard to the transfers made during several dates in March 1953, in the aggregate amount of $51,460, we proceed to examine the record. Under the language of the statute, the transfers in March 1953, having been within approximately nine months of the time of death, are "deemed to have been made in contemplation of death", unless shown to the contrary. The only evidence in the record is that on behalf of the personal representatives of decedent and not contradicted. The witnesses for appellants were Harold H. Fogelsanger and Samuel W. Fogelsanger, being the two sons of decedent, who are interested

parties, and Miss Mary Elizabeth Robertson, who had been housekeeper for decedent, and Dr. Gilda, the latter two being disinterested witnesses.

A fair summary of the evidence would indicate the following:

1. In March 1953, at the time of the transfers, Mrs. Fogelsanger was in advanced years, namely, the age of 79.

2. She was a woman who was conscious of her health and for many years had made regular visits to the doctor and apparently attended reasonably to his instructions, having been treated by Dr. Gilda periodically from approximately 1938 to the time of her death on December 1, 1953.

3. From 1938 on, decedent had been subject to secondary anemia and arterio-sclerosis, the latter being an ailment common to those of advancing years which is of a progressive nature.

4. In 1948 Dr. Gilda had noted a heart murmur in decedent.

5. In 1952 decedent became subject to an ailment known as thrombocytopenia, in which there is bleeding from the gums and other membranes of the body. Patches having the appearance of bruises appeared at various spots on decedent's body, principally the arms and legs.

6. Because of the latter ailment, and inasmuch as the cortone treatment therefor did not prove effective, decedent became a patient under observation in the Chambersburg Hospital from July 22, 1952, until August 8, 1952, from which she went to Temple University Hospital, Philadelphia, where, in order to cope with this malady, decedent's spleen was removed October 8, 1952, and she was discharged and returned to Chambersburg on October 31, 1952. There appeared to be considerable improvement in outward evidence of this malady thereafter.

7. Dr. Gilda resumed care of decedent at Chambersburg in the fall of 1952 and decedent visited him at intervals of about one week which became lengthened until two or three-week intervals during the winter, spring and summer of 1953.

8. On or about March 13, 1953, unknown to Dr. Gilda, Mrs. Fogelsanger was operated on at Harrisburg for removal of a papilloma from her forehead, which resulted in considerable bleeding, probably because of the thrombocytopenia. On the same day she came to Dr. Gilda's office where she was treated over a period of about three weeks when the condition apparently cleared up.

9. During the succeeding months of 1953, Mrs. Fogelsanger pursued her usual routine of life and of visits to her doctor and on Sunday, November 29, 1953, she was at services in Central Presbyterian Church, Chambersburg, as usual. The next morning she suffered an attack of acute congested heart failure and died on Tuesday, December 1, 1953, of a cause certified by Dr. Gilda as arterio-sclerotic heart disease and as contributing cause, idiopathic thrombocytopenia.

10. Mrs. Fogelsanger had, over the years, been informed by Dr. Gilda of the various maladies above referred to, but had not been informed that any of them would lead to death in the early future, nor did she at any time express to him or anyone else, so far as the evidence shows, any expectation or apprehension on her part of death in the foreseeable future.

11. Following the death of her husband in 1922, Mrs. Fogelsanger, who had been the bookkeeper for the rather large milk business of the Fogelsanger family in earlier years, remained the widow of H. H. Fogelsanger and busied herself entirely in the ensuing years until 1953 with the management of her home on Commerce Street in Chambersburg, in handling her

investments and about her associations at the church and with her friends.

12. Decedent took an especial interest in financial matters, in the reading and study of investment publications, stock market reports, conferences with her investment adviser, Mr. J. Clair Sowers, of Baltimore, and in the buying, selling and managing of her securities.

13. From 1922 until 1953, decedent managed to increase the value of her estate from some $75,000 to approximately $250,000.

14. During all the years up until the day preceding her death, it appears that the decedent was never bedfast, except for the summer of 1952 when she was in the hospital. As a general matter, she consulted the doctor at his office rather than at her home and in most instances, walked there or walked downtown from that office to the bank and elsewhere, or at times called a taxi, and similarly on her weekly visits to and from church and elsewhere. She did her downtown shopping and banking alone up to the end.

15. All the evidence indicates that, contrary to the mere fact of age, Mrs. Fogelsanger was a woman who was busy with the various affairs of life and was not given to occupying herself with contemplation or apprehension of death.

16. On a good many occasions over the five years or more preceding her death, decedent had expressed to her sons and to her investment adviser her plan and her intention that as soon as her total estate would reach or exceed the value of $200,000, she intended to make a substantial gift or gifts to her sons. She arrived at the figure of $200,000 by concluding that the income from such an amount would be sufficient to maintain her expenses of living in the style to which she was accustomed.

17. It appears that neither of the two sons nor the daughter-in-law, who were recipients of the transfers in March, 1953, was in any particular need of gifts, although the sons were engaged in substantial business enterprise in Philadelphia and may have had some use for additional funds or property.

18. A normal and proper relationship of harmony existed between Mrs. Fogelsanger and her sons and daughter-in-law and these latter were the natural objects of her bounty; they visited her in Chambersburg at intervals and in general had a warm filial relationship with Mrs. Fogelsanger.

19. Decedent had stated that she had more income than she needed and she wanted her children to enjoy some of it while she was living.

20. It is reasonable to believe that Mrs. Fogelsanger as a business woman was aware of at least some of the tax features involved in transferring her estate during her lifetime and at her death.

We do not take into consideration the evidence in the record with regard to decedent's state of mind at times *following* the transfers of March, 1953, including her known expectation and plans for making a trip to Florida in the winter of 1953-1954, for the reason that this case must turn upon decedent's condition of mind at and about the time the transfers were made in March, 1953, rather than her intentions at a later date.

The factors to be considered in deciding upon the question of "contemplation of death" have been referred to as: (1) Ascertainment whether transferor's primary motive in making the gift is the thought of death and a desire to anticipate the event; (2) what other motive decedent had in making the transfer; (3) the condition of body and mind of transferor; (4) his age; (5) his desire to be relieved of responsibility; (6) his desire to discharge any moral obligations; (7) his

purpose to carry out some previously adopted policy with reference to the objects of his bounty; (8) the length of time elapsing between the gift and the death; (9) whether the gift was all of or a substantial portion of transferor's property.

In the very skillful argument of the Commonwealth, strong emphasis is placed upon the principle that where a gift is made within a period of one year of death, the presumption that it was made in contemplation of death will follow, *unless* there is an adequate showing of some *other* motive. The Commonwealth thus contends that the presumption cannot be overcome by merely negativing that decedent was actuated primarily by a contemplation of death, but there must be a positive showing in the evidence of some other motive which predominated.

Under the present evidence, it seems clear that the motive which actuated Mrs. Fogelsanger was that of benefiting her children and daughter-in-law during her lifetime. It is much more pleasant to receive the gratitude of one's object of affection while one is living than from the grave. There is ample evidence further that Mrs. Fogelsanger had a fixed and expressed purpose for some three or more years before 1953 to make substantial gifts to these natural objects of her affection, based upon her increasing assets and to be consummated after they had exceeded a value of $200,000.

From the competent evidence, it is our considered conclusion that the master's conclusion is correct, that the "contemplation of death" which by operation of the statute attaches to the gifts in question has been sufficiently rebutted, that the gifts, though made within a year of death (in this case approximately nine months prior thereto), were not made in contemplation of death.

Cases supporting the view here taken are Wanamaker's Estate, 8 D. & C. 569; Smith Estate, 77 D. & C.

574; Bisbee Estate, 89 D. & C. 309; Staudt Estate, 75 D. & C. 121; Baker's Estate; 39 D. & C. 405.

In support of the contrary position, the Commonwealth cites a number of cases. In Strasser's Estate, 34 Del. Co. 166 (1946), there was a decedent 79 years of age who was not in good health and had transferred a savings account, substantially all his estate, into the joint name of himself and a friend within three months of death. The amount of the transfer was held to be taxable.

In Moyer's Estate, 43 Berks 113 (1951), decedent had been suffering from diabetes and died of a coronary disease. His doctor had not informed him of the state of his health, the illness had been progressive and decedent had been unable to walk more than a brief distance, was of a gloomy disposition and four months before death had transferred a savings account, his entire estate, into the joint names of himself and a friend in order that bills could be paid in event he became ill. The transfer was held to be in contemplation of death.

In Cowan's Estate, 78 D. & C. 543 (1951), decedent was aged 66 and during the preceding 10 years had been five times in the Westmoreland Hospital for periods of two weeks or less; he had until a week from his death been an active businessman, seeing the doctor at the office or home once a week, the physician had never informed decedent of the nature of his illness; decedent had married seven months before his death and shortly after marriage had transferred substantial bank accounts into the name of himself and wife, in the total sum of $171,674.83. The amount transferred was the entire assets, or a considerable part thereof, of decedent. He died of hypertension and heart disease with congestive failure. The court held that the statutory presumption had not been rebutted.

588

Upon consideration, we do not find that those holdings or the facts involved overcome the force of the executor's evidence and position in this present case.

Now, this January 19, 1957, the exceptions to the master's report, except insofar as sustained by his supplemental report, are dismissed, and the findings of fact as amended, conclusions of law and recommendation of the master are confirmed and adopted. The appeal from the appraisement of the transfers of August 4, 1949, March 4, 5 and 12, 1953, is sustained and the assessment thereon is set aside, the tax paid thereon of $1,256.97 was not due, and upon proper application the same shall be refunded.

Now, this January 19, 1957, exception is granted to the Commonwealth of Pennsylvania.